Sarkis Ourfalian, Esq., State Bar No.: 128528
  *Sarkis@ourfalianlaw.com*
Rafi Ourfalian, Esq., State Bar No.: 97781
  *Rafi@ourfalianlaw.com*
**OURFALIAN & OURFALIAN**
700 N. Brand Blvd., Suite 1150
Glendale, California 91203
Telephone: (818) 550-7777
Facsimile : (818) 550-7788

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GRACE LARA, an individual, STEPHANIE AUDISH, an individual, MARCO AGUILERA, an individual, ALINA PANOSSIAN, an individual, KARO PANOSSIAN, an individual, ALINE OHANIAN, an individual, LEAH PATILLE ENESHIAN, an individual, ALLYSSA PEREZ, an individual, FELIX PEREZ, an individual, ARLENE PEREZ, an individual, JEIRLAND BANAAG, an individual, GLENN BANAAG, an individual, MICAH ANGELA BANAAG, an individual, EVELYN MEGIAN, an individual, BRANDON MEGIAN, an individual, KAMALESH DAHAGAM, an individual, BHAVANA DAHAGAM, an individual, V. D., a minor, by and through KAMALESH DAHAGAM, as their Guardian *ad Litem* | Case No. 2:25-CV-1143 **COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL** |

Plaintiffs,

v.

CHIQUITA CANYON, LLC, a Delaware Limited Liability Company; CHIQUITA CANYON, INC., a Delaware Corporation; WASTE CONNECTIONS US. INC., a Delaware Corporation; and DOES 1-150, inclusive,

Defendants.

COME NOW the PLAINTIFFS GRACE LARA, an individual, STEPHANIE AUDISH, an individual, MARCO AGUILERA, an individual, ALINA PANOSSIAN, an individual, KARO PANOSSIAN, an individual, ALINE OHANIAN, an individual, LEAH PATILLE ENESHIAN, an individual, ALLYSSA PEREZ, an individual, FELIX PEREZ, an individual, ARLENE PEREZ, an individual, JEIRLAND BANAAG, an individual, GLENN BANAAG, an individual, MICAH ANGELA BANAAG, an individual, EVELYN MEGIAN, an individual, BRANDON MEGIAN, an individual, KAMALESH DAHAGAM, an individual, BHAVANA DAHAGAM, an individual, V. D., a minor, by and through KAMALESH DAHAGAM, as their Guardian *ad Litem*, (collectively, "Plaintiffs") by and through their attorneys of record, Sarkis Ourfalian, Esq. and Rafi Ourfalian, Esq., for their demand for jury trial against Defendants, CHIQUITA CANYON, LLC, a Delaware Limited Liability Company; CHIQUITA CANYON, INC., a Delaware Corporation; WASTE CONNECTIONS US. INC., a Delaware Corporation; and DOES 1-150, inclusive, and each of them (collectively "Defendants"). Plaintiffs allegations are based upon personal knowledge as to Plaintiffs' own experiences and on information and belief as to all other matters based on an investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery:

## INTRODUCTION

1.     Plaintiffs bring this action against Defendants Chiquita Canyon, LLC, Chiquita Canyon, Inc., and Waste Connection US, Inc. Defendants operate the Chiquita Canyon Landfill ("Landfill"), a 639-acre municipal solid waste landfill, located in the northern section of Los Angeles County. The Landfill has served Los Angeles County for more than five decades. Several neighborhoods, parks, schools, and businesses surround the Landfill and are impacted by its operations.

2.     Since approximately May of 2022, the Landfill has been experiencing a significant subsurface reaction ("Subsurface Reaction") that has grown in size and

impact over the last two years. The Subsurface Reaction now covers 35 acres and is just 1,000 feet from the nearest residence. Defendants caused and failed to prevent the Subsurface Reaction.

3.    This Subsurface Reaction has caused noxious odors and toxic gases to emanate from the Landfill, making living conditions around the Landfill unbearable and causing the residents in the surrounding neighborhoods to experience headaches, nosebleeds, respiratory issues, heart problems, and emotional distress, among other harms.

4.    The Subsurface Reaction has also caused the Landfill to produce large amounts of leachate—a liquid made by landfills that leaches, or draws out, chemicals or constituents from the waste buried in the landfill. Because of the Subsurface Reaction, the Landfill's leachate contains elevated levels of benzene and other hazardous substances. Leachate emits noxious odors and chemicals and can be toxic to humans when exposed to ambient air. Defendants have actively mismanaged the substantial increase in leachate production at the Landfill. After their leachate collection system failed, Defendants concealed leachate outbreaks at the Landfill from regulatory agencies and the public. They allowed leachate to pool in ponds and flow in rivers across the property. Leachate under high pressure has erupted at the surface of the Landfill in geyser-like events spewing toxic chemicals into the air. The Landfill is now producing over a million gallons of leachate a week. Unable to dispose of this liquid properly and legally, Defendants have illegally dumped the toxic liquid into the Santa Clara River.

5.    Defendants caused this Subsurface Reaction. Defendants then failed to detect the Reaction in a timely manner and, since it was discovered, have failed to stop the Reaction or abate its effects. Indeed, Defendants' mismanagement of their response to the Subsurface Reaction has unnecessarily elongated its effects.

6.    Defendants' actions have created a severe nuisance and harmed the health and property of nearby residents and workers.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

7.      Plaintiffs seek injunctive relief and compensatory and punitive damages for the extensive harm they have suffered because of Defendants' actions.

## JURISDICTION AND VENUE

8.      Jurisdiction in this Court is proper under 28 U.S.C. § 1332(d)(a)(1) because there is complete diversity between the parties.

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (b)(1) because a substantial part of the events giving rise to the claims occurred in the Central District of California and because Defendants all reside there.

## THE PARTIES

10.      Plaintiffs are approximately 18 individuals who have been damaged by the Subsurface Reaction. These individuals currently live or work around the Landfill or use to live or work around the Landfill, but were forced to move away from the Landfill because of the Subsurface Reaction.

11.      Defendant Chiquita Canyon, LLC, is, and at all relevant times mentioned herein was, a limited liability company duly formed under Delaware law, with its principal place of business located at 3 Waterway Square PL #110, The Woodlands, Texas 77380.

12.      Defendant Chiquita Canyon, Inc., is, and at all relevant times mentioned herein was, a corporation duly formed under Delaware law, with its principal place of business located at 3 Waterway Square PL #110, The Woodlands, Texas 77380.

13.      Defendant Waste Connections US, Inc. ("Waste Connections"), is, and at all relevant times mentioned herein was, a corporation duly formed under Delaware law, with its principal place of business located at 3 Waterway Square PL #110, The Woodlands, Texas 77380.

14.      On information and belief, Defendant Waste Connections is the sole owner of Defendant Chiquita Canyon, Inc.

15.      Defendant Chiquita Canyon, Inc., is the sole member of Defendant Chiquita Canyon, LLC.

16.    Defendants, primarily through Chiquita Canyon, LLC, operate the Landfill, which is located at 29201 Henry Mayo Dr. Castaic, CA 91384.

17.    On information and belief, Waste Connections exercises significant control of Chiquita Canyon, Inc. and Chiquita Canyon, LLC, including but not limited to the general management of, and daily activities at, the Landfill.

18.    Waste Connections, Chiquita Canyon, Inc., and Chiquita Canyon, LLC at all relevant times had a unity of interest and ownership such that any individuality and separateness between them has ceased, and each such entity is the alter ego of each other entity.

19.    Waste Connections, Chiquita Canyon, Inc., and Chiquita Canyon, LLC present themselves to the public as one entity. For example, the Chiquita Canyon Landfill website is entitled "Chiquita Canyon A Waste Connections Company."

20.    The following branding is featured prominently on the Landfill website, at the physical entrances to the Landfill, and on letterhead used by Landfill employees:



21.    All three Defendants have the same principal office.

22.    On information and belief, all three Defendants have the same executive management team.

23.    Both Waste Connections and Chiquita Canyon Inc. have the same three corporate officers: Patrick Shea (Secretary), Mary Anne Whitney (Chief Financial Officer), and Ronald J. Mittelstaedt (Chief Executive Officer). All three of these individuals are Waste Connections employees.

24.     The two "Managers or Members" of Chiquita Canyon LLC, as identified on its Statement of Information filed with the California Secretary of State, are Chiquita Canyon, Inc. and Ronald J. Mittelstaedt.

25.     Documents filed with California governmental entities that regulate the Landfill say that the Landfill "is owned and operated by Chiquita Canyon LLC, which is a wholly-owned subsidiary of Waste Connections, Inc."

26.     Defendants repeatedly misrepresent their corporate form to the public, creditors, and others. Many of the employees operating the Landfill on a day-to-day basis are not Chiquita Canyon LLC employees, but rather Waste Connections employees. Waste Connections, not Chiquita Canyon LLC or Chiquita Canyon Inc., hire, manage, and provide benefits to the employees that work at the Chiquita Canyon Landfill.

27.     In addition, many of the individuals appearing at public hearings regarding Landfill operations are not Chiquita Canyon LLC employees, but rather Waste Connections employees.

28.     For example, Steve Cassulo and John Perkey regularly appear at the monthly meetings of the Community Advisory Committee for Chiquita Canyon Landfill on behalf of the Landfill operator.

29.     Mr. Cassulo, the primary spokesperson for the Landfill, has publicly identified himself as both a District Manager for Waste Connections and a District Manager for Chiquita Canyon LLC. He signs his letters as "District Manger Chiquita Canyon LLC," but uses an email address with a Waste Connections email domain and lists Waste Connections as his employer on several social media sites.

30.     John Perkey does not purport to work for Chiquita Canyon LLC. He is the Vice President, Deputy General Counsel of Compliance and Government Affairs for Waste Connections. However, he regularly speaks on behalf of, and directs the legal decisions for, Chiquita Canyon LLC.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

31.    On information and belief, Chiquita Canyon Inc. and Chiquita Canyon LLC are inadequately capitalized and operate as shell companies to shield Waste Connections from debts and liabilities that may arise related to the operation of the Chiquita Canyon Landfill.

32.    Instead of directly acquiring and operating the Landfill entirely on its own, Waste Connections first formed Chiquita Canyon Inc. in 2009 for the sole purpose of acquiring the Landfill. Chiquita Canyon Inc. does not appear to have any employees or operations. It appears to own just one asset: Chiquita Canyon LLC. Chiquita Canyon Inc. thus operates solely as a shell corporation. The only purpose of forming and maintaining such a shell is to cabin the liability exposure of its parent, Waste Connections.

33.    Although it does not have any operations or employees, Chiquita Canyon Inc. has held itself out as financially responsible for the debts of Chiquita Canyon LLC. Landfill operators in the state of California are required to provide to state agencies that regulate landfills "financial assurance" that they will be able to pay for the costs of closure of the landfill, post-closure maintenance, and corrective action costs. To satisfy this requirement, Chiquita Canyon Inc., *not* Chiquita Canyon LLC, provided three surety bonds totaling nearly $40 million. Significantly, the cost estimates that form the basis for these bonds budgeted $0 to cover the cost of a subsurface fire or elevated temperature landfill event.

34.    On information and belief, Chiquita Canyon Inc. is inadequately capitalized to guarantee the closure, post-closure, and corrective action costs for the Chiquita Canyon Landfill. On information and belief, the anticipated closure, post-closure, and corrective action costs for the Chiquita Canyon Landfill exceed hundreds of millions of dollars, and despite full knowledge of those anticipated costs, Defendants structured themselves with the deliberate intent that Chiquita Canyon Inc. and Chiquita Canyon LLC be undercapitalized and unable to shoulder these costs, and thereby operate as a shell designed to inequitably and wrongfully insulate Waste

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Connections from the corresponding liabilities for the benefits it received from these subordinate entities.

35.     Waste Connections, Inc. is a publicly held company and the parent company to Waste Connections US. Waste Connections, Inc. has held itself out to the public, shareholders, and creditors as potentially responsible, through Waste Connections US, for Chiquita Canyon LLC's and Chiquita Canyon Inc.'s debt. In its 2023 annual report to shareholders, Waste Connections, Inc. reported as follows:

> Our accruals for our landfill site closure and post-closure costs **may be inadequate**.
>
> We regularly accrue amounts and establish reserves to pay capping, closure and post-closure maintenance costs for landfill sites that we own and operate as well as for landfills we operate under life-of-site agreements. Our obligations to pay closure or post-closure costs sometimes exceed the amount we have accrued and reserved and other amounts available from funds or reserves established to pay such costs, resulting in adjustments to accruals and reserves and additional costs. The completion or closure of a landfill site does not end our environmental obligations. **After completion or closure of a landfill site, we sometimes incur additional costs, including recently as a result of an elevated temperature landfill ("ETLF") event, which has resulted in increased leachate generation and related capital and operating expenses that have increased our closure and post closure costs at our Chiquita Canyon Landfill.** In addition, environmental problems may occur that could result in substantial remediation costs, regulatory enforcement actions and related fines or potential litigation. The potential increased regulation of per- and polyfluoroalkyl substances ("PFAS"), bisphenol A ("BPA") phthalates, methane and other emerging contaminants could result in greater expenditures for closure and post-

8

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

closure costs. It is also possible that accruals may need to be expanded and that costs incurred related to these activities could be accelerated. **Paying additional amounts for closure or post-closure costs and/or for environmental remediation and/or for litigation could harm our financial condition, operating results, or cash flow.**

36.    Based on this and other information and belief, Chiquita Canyon LLC is inadequately capitalized and will be unable to pay for the costs to continue operating the Landfill and to address the many costs associated with the Subsurface Reaction. These costs already include, among other things: (1) labor and material costs to implement remediation measures ordered by local, state, and federal agencies, for example, the cost to conduct air monitoring, install a geosynthetic cover over the Subsurface Reaction, install gas and leachate extraction equipment, and store and ship leachate offsite; (2) costs to pay fines to the numerous state, local, and federal agencies that have sanctioned Chiquita Canyon LLC; (3) costs to investigate the cause of the Subsurface Reaction; (4) legal and other costs to defend against the civil and regulatory actions that have been filed against Chiquita Canyon LLC; and (5) environmental remediation costs. On information and belief, Waste Connections anticipated these events and costs and structured its corporate form in a deliberate attempt to obtain the benefits of the Landfill without the corresponding liabilities. In addition, if this, and other civil lawsuits that have been filed against Chiquita Canyon LLC are successful, then these costs could include damages for harm suffered by thousands of individuals living around the Landfill, the cost to relocate individuals and families living next to the Landfill, and ongoing medical monitoring.

37.    The Landfill stopped accepting solid waste on December 31, 2024. As a consequence, the Landfill currently has little to no income to pay for these many costs. In addition, there is a real possibility that the Landfill's permits may be revoked or that the shutdown becomes permanent, meaning the Landfill will never have additional income in the future to pay for these many costs.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

38.     Given that Waste Connections exercises significant control over Chiquita Canyon LLC, has used the formation of Chiquita Canyon LLC and Chiquita Canyon Inc. to shield itself from liability, has misrepresented the corporate form, and both Chiquita Canyon LLC and Chiquita Canyon Inc. are inadequately capitalized to pay for their known and foreseeable costs, it would promote an injustice to treat Waste Connections, Chiquita Canyon LLC, and Chiquita Canyon Inc. as separate corporate entities, and not the alter egos of one another. To treat Waste Connections, Chiquita Canyon LLC, and Chiquita Canyon Inc. as separate corporate entities would permit Waste Connections to continue to shield itself from liability using the corporate form and would unjustly prevent Plaintiffs from recovering any or all the damages they are entitled to because the entities whose names appear on the Landfill's operating permits and who have claimed primary responsibility for harms caused by the Landfill—Chiquita Canyon LLC and Chiquita Canyon Inc.—are severely undercapitalized and unable to pay for their costs.

39.     The names of other Defendants and/or their involvement in the events giving rise to Plaintiffs' claims are unknown to Plaintiffs at this time. Plaintiffs therefore sue such Defendants in this action by fictitious names, identified as Does 1-50. Plaintiffs will seek leave of the Court to amend this pleading to reflect the true names and capacities of the Defendants designated as Does 1-50 when their identities and/or involvement become known.

40.     Defendants are jointly and severally liable to the Plaintiffs for the injuries and damages Plaintiffs sustained as a proximate result of Defendants' conduct. Each Defendant committed, conspired to commit, and/or ratified each of the acts and omissions alleged in this Fourth Amended Complaint. Each of the Defendants acted as the agents, servants, employees and/or joint venturers of each other and each was acting within the course and scope of their agency, service, employment and joint venture at all relevant times. In addition, all acts performed by each Defendant while

acting as an agent, servant, employee and/or joint venturer have been adopted and ratified by each other Defendant.

## STATEMENT OF FACTS

41.    The Chiquita Canyon Landfill is a 639-acre Class III landfill located in the northern section of Los Angeles County.

42.    The Landfill is located immediately next to or nearby multiple towns and residential neighborhoods including Val Verde, Castaic's Hasley Canyon, Hasley Hills, Hillcrest, Live Oaks, and Williams Ranch neighborhoods, Santa Clarita, Stevenson Ranch, and Valencia.

43.    These towns and neighborhoods are home to several thousand residents, as well as schools, parks, and churches.

44.    The Landfill is also located next to a commercial center, which is home to several dozen businesses and a post office.

## I.    The History of the Communities Involved

45.    The surrounding communities have long histories that stretch back far before the Landfill was created.

46.    Val Verde was settled by Spanish settlers around a gold strike in the 1800s. The area had already been inhabited by the Chumash, Gabrieleño, Fernandeño, Vanyume and Tataviam cultures from about A.D. 450 to the early 19th Century.

47.    In 1924, a group of Black Los Angeles professionals bought 1,000 acres to build a resort in the hills west of Castaic Junction between Hasley Canyon and the Santa Clara River, in what is now known as Val Verde. The resort thrived and the surrounding community expanded. Over the decades, the community transformed from vacation homes to primary residences for its residents. Val Verde is now a diverse community of working-class people with a population of approximately 3,177. It is located to the west of the Landfill.

48.    Hasley Canyon, a community in Castaic, California, just north of the Landfill, began to be developed in the 1970s. It is a horse-riding community with

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

miles of trails and many ranch properties. Hasley Canyon now has a population of approximately 1,450.

49.    The Hasley Canyon Equestrian Center, located just feet from the Landfill, is a sixty-seven-acre facility along Hasley Creek featuring a fenced arena, horse warm-up area, equestrian barn with office and storage space, equestrian trail connections and day use parking for horse trailers and cars. This center provides a public location for local equestrian enthusiasts and professionals, law enforcement mounted units, and educational facilities.

50.    Live Oaks, a community in Castaic, California located northeast of the Landfill, developed in the 1980s. It contains Live Oak Elementary School and Hasley Canyon Park.

51.    The Hasley Hills community of Castaic, California, located immediately to the north and northwest of the Live Oaks community, was developed from 1988 – 2003.

52.    The Hillcrest community of Castaic, California, was developed north of Hasley Canyon from the early 1990s to the early 2000s. Hillcrest has approximately 8,560 residents.

53.    The Williams Ranch community is currently being built between the Hasley Hills and Hasley Canyon communities. The developers plan to build 497 new homes there.

54.    Recently, the County approved the development of another community, Sterling Ranch Estates, immediately north of the Landfill.

**II.    The History of the Chiquita Canyon Landfill**

55.    The Chiquita Canyon Landfill was first approved for a land reclamation project by the Los Angeles County Planning Commission on December 21, 1965.

56.    The Landfill initially operated under a series of zoning entitlements. Then, on November 24, 1982, the Landfill obtained Conditional Use Permit ("CUP")

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1809, which permitted the Landfill to expand and continue operating under certain conditions until November 24, 1997.

57.     Prior to the expiration of CUP 1809, the Landfill operator, then Laidlaw Waste Management Inc., applied for another conditional use permit to further expand and extend the life of the Landfill.

58.     On May 20, 1997, the Los Angeles County Board of Supervisors granted the Landfill Conditional Use Permit 89-081(5).

59.     CUP 89-081(5) authorized the lateral and vertical expansion of the Landfill. Under CUP 89-081(5), the Landfill was permitted to operate as a Class III until it reached a waste capacity of 23 million tons or until November 24, 2019, whichever occurred first. Class III landfills can only accept non-hazardous solid waste.

60.     CUP 89-081(5) imposed caps on the amount of waste the Landfill could receive daily and weekly. The Landfill was permitted to accept up to 6,000 tons of waste per day and up to 30,000 tons of waste per week.

61.     In the process of applying for CUP 89-081(5), Laidlaw Waste Management Inc. reached an agreement with the Val Verde Civic Association that would allow the Landfill to remain open until 2019 in exchange for $250,000 a year for community improvements.

62.     After the Landfill changed ownership several times, in 2009, Waste Connections, Inc. purchased the Landfill from Republic Services through its wholly owned subsidiary Chiquita Canyon, Inc.

63.     Thereafter, Chiquita Canyon, Inc. is identified in all public documents as the owner and operator of the Landfill until around 2017, at which time Chiquita Canyon, LLC is identified as the owner and operator of the Landfill.

64.     In or around July 2011, Defendants began applying for permits to again expand and extend the life of the Landfill.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

65.    Among other things, their proposed plan sought to expand the waste disposal footprint from 257 acres to 400 acres; increase the maximum elevation of the Landfill from 1,430 feet to 1,573 feet; and double the daily and weekly caps on the amount of waste the Landfill could receive (increasing these caps to 12,000 tons and 60,000 tons respectively).

66.    Over the next several years, the Los Angeles County Department of Regional Planning assessed the proposed expansion and its environmental impacts and held public hearings regarding the same.

67.    The surrounding communities vehemently opposed the expansion. They had serious concerns about how the continued operation and expansion of the Landfill would impact public health, air quality, traffic, the environment, property values, water qualities, and biological resources surrounding the Landfill.

68.    Residents from the surrounding communities gave oral testimony at public hearings on the matter and contacted Defendants and the Los Angeles County Department of Regional Planning in writing and by phone to express their opposition.

69.    In 2015, the Landfill was nearing its 23-million-ton limit, but the Los Angeles County Department of Regional Planning had not yet approved or denied Defendants' expansion plan.

70.    By letter dated November 19, 2015, Mike Dean, Division Vice President for Waste Connections, requested that the Director of the Los Angeles County Department of Regional Planning grant Defendants a temporary waiver to permit the Landfill to exceed the 23-million-ton limit during the pendency of the application to avoid a temporary closure of the Landfill while the application was pending.

71.    On March 17, 2016, Richard Bruckner, the Director of Planning for the Los Angeles County Department of Regional Planning granted Defendants a waiver that permitted the Landfill to accept up to 29.4 million tons of waste while the expansion permit was pending.

72.     In the spring of 2016, the Landfill reached and exceeded the 23 million tonnage limit allowed under CUP 89-081(5), but it continued to operate under the waiver granted by Director Bruckner.

73.     On July 25, 2017, Los Angeles County approved Defendants' expansion plan and granted them Conditional Use Permit No. 2004-00042-(5).

74.     The new CUP authorized the Landfill to continue operating and expanding for another 30 years.

75.     The new CUP laterally expanded the waste disposal area by 149 acres to a total area of 400 acres.

76.     For the first roughly seven years under the new CUP—from 2017 through December 31, 2024—the Landfill was permitted to intake 2,800,000 tons of "combined solid waste and beneficial use materials" each year—on average approximately 54,000 tons of waste each week.

77.     For the next roughly 23 years—from January 1, 2025, through 2047—the Landfill was permitted to intake 1,800,000 tons each year of "combined solid waste and beneficial use materials"—on average approximately 35,000 tons of waste each week.

78.     CUP 2004-00042-(5) contains 130 detailed "conditions of approval."

79.     For example, under section 12, Defendants must "develop[], maintain[], and operate[] [the Landfill] in full compliance with the conditions of [the CUP], and any [applicable] law, statute, ordinance, or other regulation."

80.     Under section 63, Defendants must ensure the Landfill does not "create a nuisance in the surrounding communities," and must "adopt and implement operational practices to mitigate air quality impacts including, but not limited to, odor, dust, and vehicular air quality impacts" "[a]s required by the SCAQMD."

81.     Under sections 65 and 68, Defendants must conduct air and Landfill gas monitoring that meets certain specifications.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

82.    Under section 64, Defendants must "use Landfill gas for energy generation at the Facility or other beneficial uses, rather than flaring to the extent feasible[.]"

83.    Under section 20, any person violating a provision of the CUP is guilty of a misdemeanor and the Regional Planning Commission may revoke or modify the CUP if it determines that any condition of the CUP has been violated, or that the CUP "has been exercised so as to be detrimental to the public's health or safety, or so as to be a nuisance[.]"

84.    Under section 15, the Los Angeles Department of Regional Planning or the Los Angeles County Department of Public Health can order the immediate termination of Landfill operations if either determines that it is "necessary for the health, safety, and/or welfare of the County's residents or the environment."

### III.    The Subsurface Reaction

85.    On information and belief, beginning in approximately May of 2022, a reaction began to occur underground in an inactive portion of the Landfill located in the northwestern corner. This Subsurface Reaction is characterized by extreme temperature increases, excessive leachate production, and a change in composition and volume of the landfill gas.[1]

86.    The communities nearby the Landfill had no idea that this Subsurface Reaction was occurring in May 2022.

---

[1] There has been some debate about whether the Subsurface Reaction is a "subsurface oxidation" event—which occurs when oxygen infiltrates landfill cover and causes a chemical reaction—or an "elevated temperature landfill" event—which can also be caused by a chemical reaction, but not oxygen infiltration. The two types of subsurface events have similar symptoms, but different causes. For the purposes of this Fourth Amended Complaint, the exact type of event that is occurring is not relevant.

87.    This Subsurface Reaction continued for a full year until the odors emanating from the Landfill alerted the nearby communities that something was happening at the Landfill.

**A.    In February 2023 Defendants ask for an emergency ex parte permit variance after detecting elevated levels of dimethyl sulfide in Landfill gas.**

88.    A natural byproduct of the decomposition process that occurs in any landfill is a gaseous substance known as "landfill gas."

89.    The Chiquita Canyon Landfill, like most landfills, contains a landfill gas collection system that amasses gas created by the Landfill and directs it to be used for energy generation or combustion at a landfill flare.

90.    In January 2023, the Chiquita Canyon Landfill collected landfill gas using its landfill gas collection system and sent it to Ameresco Chiquita Energy, LLC ("Ameresco"), which turned it into electricity.

91.    On January 31, 2023, Ameresco shut down its landfill gas-to-energy plant after it detected high levels of sulfur in the landfill gas coming to the plant. Ameresco notified Chiquita Canyon, LLC of the shutdown.

92.    The following day, February 1, 2023, Chiquita Canyon, LLC ran lab tests on its landfill gas and discovered the gas contained elevated levels of sulfur and dimethyl sulfide.

93.    The levels of these chemicals were so high that the Landfill was either at risk of or had already violated its operating permits and the air quality rules and regulations enforced by the South Coast Air Quality Management District ("South Coast AQMD").

94.    The South Coast AQMD is the air pollution control agency for the South Coast Air Basin, which covers all of Orange County and the urban portions of Los Angeles, Riverside and San Bernardino counties. *See* Cal. Health & Safety Code §§ 40400-540.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

95.     In this role, the South Coast AQMD is under a legal obligation to enforce air quality and pollution laws and regulations within its jurisdiction.

96.     The Landfill is within South Coast AQMD's jurisdiction.

97.     South Coast AQMD has adopted rules and procedures for enforcing air quality and pollution laws and regulations. These rules and procedures are primarily meant to ensure that the surrounding (or ambient) air meets federal and state air quality standards.

98.     In addition to its Conditional Use Permit issued by Los Angeles County, the Landfill was required to obtain, and did obtain, a Title V facility permit to operate from South Coast AQMD.

99.     The Landfill was also required to obtain, and did obtain from South Coast AQMD, permits to operate the different components of the Landfill, including its landfill gas collection system and its leachate collection system.

100.    After lab tests revealed elevated levels of sulfur and dimethyl sulfide in the landfill gas, Chiquita Canyon, LLC sought an *ex parte* emergency variance, an interim variance, and a regular variance from South Coast AQMD to avoid the inevitable violation of its various permits and South Coast AQMD Rules and Regulations.

101.    On February 8, 2023, South Coast AQMD granted the request for an emergency variance with numerous conditions, including requiring Chiquita Canyon, LLC to sample and analyze the landfill gas daily, submit weekly reports regarding the landfill gas composition and its efforts to resolve the elevated chemical levels in the gas, and conduct a "root cause analysis" to determine the underlying cause.

102.    On February 15, 2023, South Coast AQMD granted Chiquita Canyon, LLC's request for an interim variance, again with conditions.

103.    Among the conditions of the interim variance was the requirement that Chiquita Canyon, LLC provide "[a]ll wellhead temperature readings, lab analysis, and

Draeger tube readings for landfill gas from the past twelve (12) months in a Microsoft Excel spreadsheet format" by February 27, 2023.

104. Chiquita Canyon LLC failed to provide the lab analysis and Draeger tube readings from the past twelve months by February 27, 2023.

105. That day, the South Coast AQMD issued a Notice of Violation to the Landfill for failing to provide this required information.

106. On May 3, 2023, South Coast AQMD granted Chiquita Canyon, LLC's request for a regular variance, again with conditions.

107. In its "FINDINGS AND DECISION" granting the regular variance, the South Coast AQMD Hearing Board concluded Chiquita Canyon, LLC "is in violation of South Coast AQMD Rules 203(b), 431.1(c)(2) and 3002(c)(l)" and that "[c]ompliance [with these Rules] will be achieved when dimethyl sulfide concentrations generated from the landfill are reduced to a level where all control devices, including Ameresco, can operate within permitted sulfur emissions limits."

108. South Coast AQMD specified that the regular variance "shall continue through February 8, 2024, or until final compliance, whichever comes first."

**B.    South Coast AQMD issues hundreds of notices of violation to Defendants regarding Landfill odors.**

109. While Chiquita Canyon, LLC was seeking its permit variance, odors emanating from the Landfill became severe enough that residents from the surrounding communities began making complaints regarding the air quality to South Coast AQMD.

110. As part of its work in enforcing air quality and pollution regulations, South Coast AQMD accepts complaints from members of the public regarding air quality problems.

111. South Coast AQMD maintains an online complaint system and a telephone hotline for accepting such complaints.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

112.   South Coast AQMD Rules contain a number of prohibitions. Relevant here, South Coast AQMD Rule 402 prohibits creating a nuisance by discharging "air contaminants or other material." This Rule provides:

**Rule 402. NUISANCE**

A person shall not discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or which endanger the comfort, repose, health or safety of any such persons or the public, or which cause, or have a natural tendency to cause, injury or damage to business or property.

113.   South Coast AQMD also enforces California Health & Safety Code Section 41700. Like South Coast AQMD Rule 402, Section 41700 provides:

(a) Except as otherwise provided in Section 41705, a person shall not discharge from any source whatsoever quantities of air contaminants or other material that cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or that endanger the comfort, repose, health, or safety of any of those persons or the public, or that cause, or have a natural tendency to cause, injury or damage to business or property.

114.   On information and belief, under South Coast AQMD's internal policies and practices, the South Coast AQMD will dispatch an investigator to investigate a potential violation of Rule 402 if it receives three nuisance complaints regarding the same issue within a one-hour period. If the investigator can confirm the source of the nuisance and is able to verify complaints made by at least six members of the public regarding the nuisance in a 24-hour period, then South Coast AQMD will issue a Notice of Violation to the source of the nuisance.

115.   On information and belief, South Coast AQMD received its first complaint from a member of the public of an odor nuisance from the Subsurface Reaction in January 2023.

116.   The complaints from community members to the South Coast AQMD regarding the odors emanating from the Landfill increased significantly in April and May of 2023.

117.   South Coast AQMD dispatched investigators to investigate these complaints.

118.   Through its investigation, South Coast AQMD traced the source of the odors back to the Landfill.

119.   South Coast AQMD also confirmed that the Landfill gas contained elevated levels of sulfur, specifically dimethyl sulfide.

120.   On May 17, 2023, South Coast AQMD issued its first Notice of Violation to the Landfill for creating a public nuisance in violation of Rule 402 and California Health & Safety Code § 41700.

121.   The odors emanating from the landfill continued to worsen and the complaints to South Coast AQMD continued to increase. The following graph shows the number of complaints South Coast AQMD received regarding the landfill from January 2023 through February 2024:[2]

---

[2] U.S. Environmental Protection Agency, March 21, 2024 Chiquita Canyon Landfill Presentation, https://www.epa.gov/system/files/documents/2024-03/presentation-chiquita-canyon-landfill-community-meeting-2024-03-21.pdf.



122.    After investigating these complaints, South Coast AQMD issued Notices of Violation to the Landfill under California Health & Safety Code § 41700, Rule 402, and other Agency Rules on the following dates: May 18, 2023, June 25, 2023, June 27, 2023, June 28, 2023, June 29, 2023, June 30, 2023, July 2, 2023, July 3, 2023, July 7, 2023, July 10, 2023, July 11, 2023, July 13, 2023, July 15, 2023, July 16, 2023, July 17, 2023, July 18, 2023, July 19, 2023, July 20, 2023, July 21, 2023, July 22, 2023, July 23, 2023, July 24, 2023, July 26, 2023, July 27, 2023, July 28, 2023, July 29, 2023, July 30, 2023, July 31, 2023, August 1, 2023, August 2, 2023, August 3, 2023, August 4, 2023, August 5, 2023, August 6, 2023, August 7, 2023, August 9, 2023, August 10, 2023, August 11, 2023, August 12, 2023, August 13, 2023, August 14, 2023, August 15, 2023, August 16, 2023, August 17, 2023, August 18, 2023, August 19, 2023, August 21, 2023, August 23, 2023, August 24, 2023, August 25, 2023, August 27, 2023, August 28, 2023, August 29, 2023, August 30, 2023, August 31, 2023, September 1, 2023, September 5, 2023, September 6, 2023, September 7, 2023, September 8, 2023, September 12, 2023, September 13, 2023, September 14, 2023, September 15, 2023, September 19, 2023, September 20, 2023, September 21, 2023, September 22, 2023, September 25, 2023, September 26, 2023, September 27, 2023, September 28, 2023, October 2, 2023, October 3, 2023, October 5, 2023,

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

October 6, 2023, October 9, 2023, October 10, 2023, October 13, 2023, October 16, 2023, October 20, 2023, October 23, 2023, October 25, 2023, October 26, 2023, October 27, 2023, November 2, 2023, November 6, 2023, November 10, 2023, November 13, 2023, November 15, 2023, November 16, 2023, November 28, 2023, and November 29, 2023, December 2, 2023, December 6, 2023, December 12, 2023, December 18, 2023, December 27, 2023, December 29, 2023, January 3, 2024, January 9, 2024, January 16, 2024, January 17, 2024, January 18, 2024, January 19, 2024, January 24, 2024, January 25, 2024, January 30, 2024, February 6, 2024, February 7, 2024, February 8, 2024, February 9, 2024, February 12, 2024, February 13, 2024, February 14, 2024, February 15, 2024, February 16, 2024, February 20, 2024, February 21, 2024, February 22, 2024, February 26, 2024, February 27, 2024, February 28, 2024, February 29, 2024, March 4, 2024, March 5, 2024, March 6, 2024, March 8, 2024, March 11, 2024, March 15, 2024, March 19, 2024, March 20, 2024, March 21, 2024, March 22, 2024, March 25, 2024, March 27, 2024, March 28, 2024, March 29, 2024, April 2, 2024, April 2, 2024, April 3, 2024, April 4, 2024, April 8, 2024, April 10, 2024, April 12, 2024, April 15, 2024, April 16, 2024, April 17, 2024, April 18, 2024, April 19, 2024, April 22, 2024, April 24, 2024, April 25, 2024, April 26, 2024, April 29, 2024, April 30, 2024, May 1, 2024, May 8, 2024, May 9, 2024, May 10, 2024, May 13, 2024, and May 20, 2024, May 21, 2024, May 22, 2024, May 22, 2024, May 24, 2024, May 28, 2024, May 29, 2024, May 30, 2024, May 31, 2024, June 3, 2024, June 4, 2024, June 5, 2024, June 6, 2024, June 7, 2024, June 11, 2024 June 12, 2024, June 13, 2024, June 14, 2024, June 17, 2024, June 20, 2024, June 24, 2024, June 25, 2024, June 26, 2024, June 27, 2024, June 28, 2024, July 2, 2024, July 3, 2024, July 5, 2024, July 8, 2024, July 9, 2024, July 11, 2024, July 12, 2024, July 15, 2024, July 16, 2024, July 17, 2024, July 18, 2024, July 19, 2024, July 22, 2024, July 23, 2024, July 24, 2024, July 25, 2024, July 30, 2024, July 31, 2024, August 1, 2024, August 2, 2024, August 5, 2024, August 6, 2024, August 7, 2024, August 8, 2024, August 9, 2024, August 14, 2024, August 16, 2024, August 19, 2024, August

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

20, 2024, August 21, 2024, August 22, 2024, August 23, 2024, August 24, 2024, August 26, 2024, August 27, 2024, August 28, 2024, August 29, 2024, August 30, 2024, September 3, 2024, September 4, 2024, September 5, 2024, September 6, 2024, September 9, 2024, September 10, 2024, September 11, 2024, September 12, 2024, September 13, 2024, September 16, 2024, September 17, 2024, September 18, 2024, September 19, 2024, September 20, 2024, September 23, 2024, September 24, 2024, September 25, 2024, September 26, 2024, September 27, 2024, September 30, 2024, October 1, 2024, October 2, 2024, October 3, 2024, October 4, 2024, October 7, 2024, October 9, 2024, October 10, 2024, October 16, 2024, October 21, 2024, October 22, 2024, October 23, 2024, October 24, 2024, October 25, 2024, October 30, 2024, October 31, 2024, November 1, 2024, November 5, 2024, November 8, 2024, November 13, 2024, November 14, 2024 November 18, 2024, November 20, 2024, November 21, 2024, November 22, 2024, November 25, 2024, December 2, 2024, December 3, 2024, December 4, 2024, December 5, 2024, December 12, 2024, December 13, 2024, December 20, 2024, December 23, 2024, and December 30, 2024.

**C.    In light of the ongoing public nuisance caused by the Landfill, numerous state agencies issue notices of violation to Defendants and South Coast AQMD seeks to revoke Chiquita Canyon, LLC's permit variance.**

123.    On July 26, 2023, the Los Angeles County Department of Public Health issued a "Public Health notice to Waste Connection, Inc. regarding the persistent foul-smelling odors emanating from the Chiquita Canyon Landfill . . . that are impacting the health of nearby residents." This Public Health notice declared that the Landfill was a public nuisance, in violation of California Civil Code § 3479 and Los Angeles County Code § 11.02.190.

124.    A few weeks later, on August 18, 2023, the Los Angeles County Department of Regional Planning issued a notice of violation to Chiquita Canyon

LLC, stating that Chiquita Canyon LLC was violating its Conditional Use Permit by creating a nuisance and failing to mitigate the air quality impacts of the facility.

125.   On August 14, 2023, South Coast AQMD filed a motion with the South Coast AQMD Hearing Board to revoke Chiquita Canyon, LLC's permit variance in light of the ongoing nuisance and issue an order for abatement. Up to that date, South Coast AQMD had received more than 1,200 complaints about the Landfill and issued 42 notices of violation of South Coast AQMD Rule 402 and Health & Safety Code Section 41700.

126.   On September 6, 2023, the South Coast AQMD Hearing Board held a hearing on the request to revoke Chiquita Canyon LLC's permit variance and issue an order of abatement.

127.   South Coast AQMD and Chiquita Canyon, LLC presented proposed findings and a stipulation of abatement to the Hearing Board at the hearing. The stipulation contained 40 separate "conditions and increments of progress" aimed at addressing the ongoing nuisance created by the Landfill.

128.   The Hearing Board adopted the proposed findings and stipulation for abatement.

129.   On October 16, 2023, CalRecyle—a branch of the California Environmental Protection Agency charged with overseeing the state's waste management, recycling, and waste reduction programs—issued a report finding that over the prior 18 months the Landfill had experienced, among other things, a "heating/smoldering event that is expanding in size and intensity," "[u]nusual landfill settlement," "Landfill gas temperatures over 170°F" and "subsurface temperatures over 195°F," and "[e]levated carbon monoxide concentration above 1000 ppmv." It further concluded that the "conditions at the CCL are causing additional gas pressure, odors, elevated leachate temperatures, and damage to the gas extraction system." CalRecycle's report proposed 15 mitigation measures to address these problems.

### D.    Agencies discover leachate outbreaks at the Landfill.

130.    In September, October, and November of 2023, staff from state, local, and national agencies, including the Los Angeles County Department of Health, CalRecycle, South Coast AQMD, Los Angeles Regional Water Quality Control Board, California Department of Toxic Substances Control, and the United States Environmental Protection Agency, conducted site visits of the Landfill. During these site visits they discovered leachate—the hazardous liquid produced by landfills—was seeping out of the ground in multiple locations, flowing through channels on the property, and pooling in ponds.

131.    During several site visits in November 2023, agency officials observed geysers of leachate erupting from the surface of the landfill up to 18 feet in the air and leachate boiling in pools.

132.    The South Coast AQMD Hearing Board's September 6, 2023 Findings and Order for Abatement had not addressed the Landfill's leachate collection and management system because South Coast AQMD did not know it was an issue at that time and Defendants had not disclosed the issue.

133.    Upon investigation, South Coast AQMD discovered that significant leachate seepage had been occurring at the Landfill for months—at least since April 2023.

134.    It was also discovered that the Landfill's leachate production had steadily increased from approximately 150,000 gallons per week in January 2022 to over 1,000,000 gallons per week in September 2023.

135.    The exposure of leachate to the atmosphere at the Landfill created a public nuisance and violated several South Coast AQMD Rules and permit requirements for the Landfill to maintain its leachate collection system in proper working order.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

136.   Defendant's failure to notify South Coast AQMD of a breakdown of its leachate collection system was another violation of South Coast AQMD's Rules and unnecessarily extended the duration of the nuisance.

137.   Directors or officers of Chiquita Canyon LLC knew about the increase in leachate production, the leachate seeps, and the breakdown of the leachate collection system at least as early as April 2023. These directors or officers deliberately hid these problems from regulators, recklessly endangering Plaintiffs and the environment, and unnecessarily extending the duration of the nuisance.

138.   The principal supervisory and management positions within Chiquita Canyon LLC are the District Manager and the Assistant District Manager. The District Manager is "[r]esponsible for the overall site, which includes operations, maintenance, environmental compliance, finance and accounting, personnel supervision, and public relations." The District Manager manages the approximately two dozen employees that work at the Landfill. The Assistant District Manager is "[r]esponsible for environmental compliance, reporting and engineering aspects of daily landfill operations."

139.   During all times relevant to this action, Steve Cassulo served as District Manager and Nicole Ward served as Assistant District Manager. Upon information and belief, during all times relevant to this action, these two individuals were present at the Landfill nearly every day, personally observed the reaction area and the leachate seeps on a near daily basis, received information from subordinates on the status of the Subsurface Reaction and leachate production and seeps on a near daily basis, directed subordinates as to how to handle and dispose of leachate, and controlled what information about the leachate production and seeps was shared with the public and regulators.

140.   During a South Coast AQMD investigation into the leachate problem in October of 2023, Assistant District Manager Nicole Ward admitted that "[s]mall [leachate] seeps have been observed around the site since mid-2022 that were

immediately cleaned up upon observation. Since April 2023, we have noticed seepage that has reached the concrete-lined storm water channel."

141.   Just days later, District Manager Steve Cassulo sent a letter to the Los Angeles County Local Enforcement Agency reporting, for the first time, that "the waste mass in the reaction area is heavily saturated with liquids" and "leachate quantities coming out of the Landfill have increased over the past two years, with a significant increase since the beginning of 2023." He included the following graph showing the total gallons of leachate the Landfill was producing each week from the beginning of 2022.



142.   Based on this, and other information, the Landfill employees, including Steve Cassulo and Nicole Ward, were tracking the Landfill's leachate production since at least January 2022, were aware that the Landfill's leachate production had increased seven-fold during that time, were aware that this excessive production created a nuisance and posed a significant threat to the health of the thousands of individuals living around the Landfill and the environment.

143.   Steve Cassulo and Nicole Ward, who are officers and/or directors of Chiquita Canyon LLC, deliberately chose not to disclose and to conceal this information from regulators and the public, and deliberately chose not to take steps to address the leachate production for months. These deliberate choices were a conscious disregard for the health and safety of those living around the Landfill and the environment.

144.   On November 7, 2023, South Coast AQMD asked the South Coast AQMD Hearing Board to set a hearing to address the leachate outbreaks observed at the Landfill.

145.   On November 22, 2023, the Los Angeles Region Water Quality Control Board ("Water Board") issued a notice of violation of the Water Board's waste discharge requirements to the Landfill. The leachate outbreaks, and the failure to report them, violated multiple rules and regulations enforced by the Water Board.

146.   The South Coast AQMD Hearing Board held a hearing to address the leachate outbreaks on January 16, 2024. By the date of the hearing, South Coast AQMD had received nearly 7,000 complaints from the community regarding the odors emanating from the Landfill and had issued 107 notices of violation to the Landfill.

147.   South Coast AQMD and Chiquita Canyon, LLC submitted a stipulation to the Hearing Board containing proposed modifications to the order of abatement that would address the leachate monitoring and collection system. The Hearing Board adopted the stipulation.

**E.   Agencies discover the Landfill's leachate contains elevated levels of toxic substances and is being discharged into local waterways.**

148.   To dispose of leachate, Defendants collect it in tanks and ship it offsite for treatment at an appropriate disposal facility.

149.   Despite knowing that the leachate may contain elevated levels of benzene as a result of the Subsurface Reaction, Defendants repeatedly failed to test

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

the leachate before shipping it offsite and repeatedly shipped the leachate to facilities that were not authorized to accept it.

150.   In late November and December 2023, and February 2024, Defendants shipped tanks of leachate to Radford Alexander Corp. D/B/A Avalon. The leachate contained benzene, a chemical that is toxic to humans, above permitted regulatory thresholds. Avalon does not have a hazardous waste treatment permit and was not authorized to treat this leachate.

151.   In January and February 2024, Defendants shipped tanks of leachate to Patriot Environmental Services that contained benzene above permitted regulatory thresholds. Patriot does not have a hazardous waste treatment permit and was not authorized to treat this leachate.

152.   On information and belief, Chiquita Canyon LLC officers and/or directors Steve Cassulo and Nicole Ward knew that leachate was being shipped offsite without being first tested for hazardous substances, such as benzene, and/or directed Landfill employees to ship leachate offsite without first testing it for hazardous substances. Steve Cassulo and Nicole Ward were responsible for Landfill operations, reporting, and environmental compliance. Thus, they were the individuals ultimately responsible for the handling and disposal of leachate at the Landfill. They were present at the Landfill nearly every day and directed a small group of employees at the Landfill to handle the disposal of leachate. The shipping of leachate offsite without first testing it for hazardous substances was reckless and a conscious disregard for the health and safety of the environment and the public.

153.   On February 15, 2024, the California Depart of Toxic Substances Control issued a notice of violations to Chiquita Canyon, LLC for shipping hazardous leachate to facilities not authorized to accept it and for its repeated failures to manage all the leachate being produced by the Landfill, which may contain elevated levels of benzene and/or other hazardous substances.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

154.    On February 16, 2024, the California Depart of Toxic Substances Control issued a Proposition 65 Notification, warning that "an illegal discharge and or a threatened illegal discharge of a hazardous waste has occurred and that such discharge or threatened discharge is likely to cause substantial injury to the public health or safety." The Notification explained that uncontrolled leachate seeps, which likely contained hazardous substances, were likely to commingle with stormwater, reach the Landfill's sedimentation basin, and be discharged offsite, including into the Santa Clara River.

155.    Unable to ship its hazardous leachate offsite, Defendants began storing more and more leachate onsite and treating some of it themselves.

156.    Unable to handle all of the leachate being produced by the Landfill, Defendants begin illegally dumping leachate into the Santa Clara River. In March 2024, Defendants were observed multiple times illegally dumping leachate into the Santa Clara River using pumping equipment mounted on top of the south stormwater detention basin spillway.

157.    On March 28, 2024, the Water Board issued a Notice of Violation to Defendants for failing to control leachate seepage and collection and permitting leachate to mix with stormwater runoff, which flowed into the Landfill's stormwater basin and into the Santa Clara River. The Notice noted that samples were taken from the stormwater basin on multiple occasions in December 2023, January 2024, and February 2024. All of those samples contained elevated levels of multiple hazardous substances.

158.    On April 9, 2024, the Water Board issued a Notice of Violation to Defendants for intentionally illegally dumping water containing unknown substances into the Santa Clara River using pumping equipment.

159.    Chiquita Canyon LLC officers and/or directors Steve Cassulo and Nicole Ward were ultimately responsible for tracking leachate production, storage, and proper disposal. On information and belief, at all relevant times they were at the

Landfill site on a near daily basis monitoring and directing the few employees assigned to handle the tracking, storage, and disposal of leachate. On information and belief, Steve Cassulo and/or Nicole Ward directed the illegal dumping of leachate or knew it was occurring and failed to stop it. Their actions in this regard were reckless and a conscious disregard for the health and safety of the environment, the public, and Plaintiffs.

**F.    After Defendants repeatedly failed to address nuisances, other agencies sanction the Landfill.**

160.   Defendants struggled to implement remediation measures ordered by the South Coast AQMD Hearing Board, the Los Angeles County Department of Public Health, Solid Waste Management Program, and others. Defendants failed to meet deadlines for the implementation of various remediation measures and repeatedly requested deadline extensions.

161.   After continuously failing to mitigate the ongoing odor and leachate problems, on February 8, 2024, CalRecycle declared its intent to include the Chiquita Canyon Landfill on the inventory of solid waste facilities which violate state minimum standards. The declaration gave Defendants 90 days to implement measures to bring the Landfill into compliance with state minimum standards regarding gas monitoring and control and site maintenance.

162.   On February 21, 2024, the United States Environmental Protection Agency issued a Unilateral Administrative Order to Chiquita Canyon, LLC, EPA DOCKET NO. RCRA 7003-09-2024-0001 and CERCLA 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-05. This order concluded that the conditions at the Landfill violated several federal laws and regulations and posed an imminent and substantial endangerment to public health and welfare or the environment.

163.   On May 15, 2024, CalRecycle issued a notice to Defendants that the Landfill had been included on the inventory of solid waste facilities which violate state minimum standards.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

164.   On June 4, 2024, the United States Environmental Protection Agency issued another notice of violation, this time finding Defendants violated multiple provisions of the Clean Air Act, including the New Source Performance Standards ("NSPS") and National Emission Standards for Hazardous Air Pollutants ("NESHAP") for municipal solid waste landfills, the NSPS and NESHAP General Provisions, as well as conditions in the Landfill's Title V permit issued by South Coast AQMD.

165.   On June 6, 2024, the Los Angeles County Department of Public Health acting as the Local Enforcement Agency issued a Compliance Order requiring Defendants to take additional mitigation measures to address the Subsurface Reaction and its effects.

166.   On June 27, the Water Board issued a notice of violation to Defendants for failure to comply with prior orders from the Water Board to take steps to investigate the potential surface and groundwater impacts caused by the "current conditions" at the Landfill.

167.   On September 11, 2024, Los Angeles Fire Department – Health Hazardous Materials Division issued a Order to Comply and Notice of Violation to the Landfill for failing to report a release or threatened release of a hazardous material to the California Office of Emergency Services (Cal OES) after a truck loaded with leachate was traveling on the asphalt hill directly north of the Main Office and overturned, releasing approximately 20 gallons of leachate and oil to the ground on September 8, 2024.

168.   Finally, on December 31, 2024, Defendants announced that the Landfill would be "closing active waste disposal operations effective January 1, 2025." Defendants stated that "due to the current regulatory environment, maintaining ongoing operations at Chiquita is no longer economically viable."

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

**G.    Throughout these events, Plaintiffs in surrounding communities were harmed.**

169.    While all of the above events were occurring, Plaintiffs were suffering. The noxious odors and toxic gases emanating from the Landfill made living conditions around the Landfill unbearable.

170.    The noxious odors and toxic gases caused Plaintiffs, all of whom live in the surrounding towns and neighborhoods, to experience headaches, nosebleeds, respiratory issues, and heart problems, amongst other harms.

171.    Plaintiffs were forced to remain inside their homes and forego the use of their yards to avoid the noxious odors and attendant health effects.

172.    Plaintiffs were also forced to keep their doors and windows closed when weather conditions otherwise would not so require, solely to avoid the noxious odors and attendant health effects.

173.    Plaintiffs also experienced significant distress about the harmful health effects of the noxious odors and toxic gases to which they and their families were exposed. For example, they worried that shorts stints outside to perform necessary tasks—like mowing their lawn—would expose them to toxic chemicals that could have unknown short and long-term health effects. As another example, they worried that allowing their children to play outside or go to school would harm their children's health in unknown ways. Plaintiffs worried that they were being harmed by toxic chemicals even when the noxious odors were not present. For some Plaintiffs the persistent, noxious odors and toxic gases, and their unknown effects, occupied their minds on a regular basis, caused daily stress, and, on occasion, significant anxiety.

174.    Plaintiffs were embarrassed by the odors and reluctant to invite guests to their homes.

175.    The odors decreased the value of Plaintiffs' properties and assets and made it difficult or even impossible for Plaintiffs to move out of the area.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

176.   The Subsurface Reaction and effects described above continue to this day and continue to cause Plaintiffs significant harm on a daily basis.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## PRIVATE NUISANCE

177.   Plaintiffs restate the allegations set forth in the preceding paragraphs.

178.   Plaintiffs all own, lease, occupy or control the properties on which they reside, which are all located near the Landfill.

179.   Noxious odors, pollutants, and air contaminants have entered and continue to enter Plaintiffs' properties.

180.   These noxious odors, pollutants, and air contaminants originated from the Landfill, specifically from landfill gas and leachate emanating from the Subsurface Reaction at the Landfill.

181.   At all relevant times, the Landfill was constructed, maintained and/or operated by Defendants.

182.   Defendants caused the Subsurface Reaction, failed to prevent the Subsurface Reaction, failed to stop the Subsurface reaction, and failed to construct, maintain, repair and operate the Landfill in a manner that would not harm Plaintiffs.

183.   Defendants have failed to abate the effects of the Subsurface Reaction, which continues to harm Plaintiffs on a daily basis.

184.   Defendants' actions or failures to act caused (and continue to cause) the noxious odors, pollutants, and air contaminants to enter Plaintiffs' properties.

185.   The odors, pollutants and air contaminants invading Plaintiffs' properties are harmful to Plaintiffs' health, indecent and/or offensive to the senses, and obstruct the free use of their property so as to substantially interfere with the comfortable enjoyment of life and/or property, including in but not limited to the following ways: causing Plaintiffs to inhale noxious and toxic gases and chemicals, which caused personal injury to them including, but not limited to, headaches, dizziness,

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

nosebleeds, difficulty concentrating, difficulty breathing, heart problems, and other latent health problems; causing Plaintiffs significant distress about the harmful health effects of the noxious and toxic gases and chemicals to which they and their families were exposed; causing Plaintiffs to remain inside their homes and forego the use of their yards; causing Plaintiffs to keep doors and windows closed when weather conditions otherwise would not so require; causing Plaintiffs embarrassment and reluctance to invite guests to their homes; and negatively impacting Plaintiffs' assets' values.

186.   Defendants' actions or failures to act were (and are) intentional and unreasonable, or unintentional, but negligent, reckless, or abnormally dangerous.

187.   The noxious odors, pollutants, and air contaminants have—and continue to—substantially interfere with Plaintiffs' use or enjoyment of their properties.

188.   An ordinary person would reasonably be annoyed or disturbed by Defendants' actions or failures to act and by the noxious odors, pollutants, and air contaminants that have entered—and continue to enter—Plaintiffs' properties.

189.   As a foreseeable, direct, and proximate result of Defendants' actions or failures to act, Plaintiffs and their families suffered, and continue to suffer, personal injuries, emotional distress, and damage to their property as alleged herein.

190.   Plaintiffs have never given consent for noxious odors, pollutants, dust, debris, and air contaminants to enter and settle upon their land and property.

191.   The seriousness of the harm caused by Defendants' actions or failures to act outweighs the public benefit of Defendants' conduct.

192.   Defendants' substantial and unreasonable interference with Plaintiffs' use, and enjoyment of their property constitutes a private nuisance for which Defendants are liable to Plaintiffs.

193.   Defendants' actions were, and continue to be, intentional, willful, malicious, oppressive, and made with a conscious disregard for the rights or safety of Plaintiffs.

194. Plaintiffs are entitled to compensatory, exemplary, and punitive damages, medical monitoring, injunctive relief, and reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and otherwise.

195. This private nuisance appears to be a continuing nuisance that may be abated. However, because the Subsurface Reaction is still ongoing and Defendants have been unable to abate its effects, the private nuisance may be a permanent nuisance. Plaintiffs reserve the right to seek all damages caused by the nuisance, whether it proves to be continuing or permanent.

**SECOND CAUSE OF ACTION**

**NEGLIGENCE**

196. Plaintiffs restate the allegations set forth in the preceding paragraphs.

197. At all relevant times, Defendants owned, operated, managed, maintained, and controlled the Landfill.

198. Defendants owed Plaintiffs the duty to exercise due care in the ownership, design, operation, management, supervision, inspection, maintenance, repair, and/or control of the Landfill.

199. Defendants further owed a duty to operate the Landfill in compliance with all applicable laws, rules, and regulations.

200. On occasions too numerous to mention, Defendants breached these duties by negligently: constructing, maintaining and/or operating the Landfill, causing the Subsurface Reaction, failing to prevent the Subsurface Reaction, failing to stop the Subsurface reaction, and failing to abate the effects of the Subsurface Reaction.

201. Defendants' negligence continues to this day, as Defendants' ongoing negligence has permitted the Subsurface Reaction and its effects to persist.

202. Defendants' negligence directly and proximately caused noxious odors, pollutants, and air contaminants, emanating from landfill gas and leachate, to invade Plaintiffs' properties and public spaces on occasions too numerous to mention.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

203.    Defendants' negligence directly and proximately caused Plaintiffs to suffer personal injury and damage to their properties as alleged herein, including: causing Plaintiffs to inhale noxious and toxic gases and chemicals, which caused personal injury to them including, but not limited to, headaches, dizziness, nosebleeds, difficulty concentrating, difficulty breathing, heart problems, and other latent health problems; causing Plaintiffs significant distress about the harmful health effects of the noxious and toxic gases and chemicals to which they and their families were exposed; causing Plaintiffs to remain inside their homes and forego the use of their yards; causing Plaintiffs to keep doors and windows closed when weather conditions otherwise would not so require; causing Plaintiffs embarrassment and reluctance to invite guests to their homes; and negatively impacting Plaintiffs' assets' values.

204.    These harms were reasonably foreseeable by Defendants.

205.    Defendants' breaches of their duties to Plaintiffs were committed knowingly, maliciously, and with a conscious disregard of the rights or safety of others.

206.    Plaintiffs are entitled to compensatory, exemplary, and punitive damages, medical monitoring, injunctive relief, and reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and otherwise.

## B.    NEGLIGENCE PER SE

207.    Plaintiffs restate the allegations set forth in the preceding paragraphs.

208.    Defendants own, operate, manage, maintain, and control the Landfill.

209.    Defendants owed a duty to operate the Landfill in compliance with all applicable laws, rules, and regulations.

210.    At all times relevant hereto, South Coast AQMD Rule 402 was in full force and effect. It provides:

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Rule 402. NUISANCE

A person shall not discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or which endanger the comfort, repose, health or safety of any such persons or the public, or which cause, or have a natural tendency to cause, injury or damage to business or property.

211.   At all times relevant hereto, California Health & Safety Code § 41700 was in full force and effect. It provides:

(a) Except as otherwise provided in Section 41705, a person shall not discharge from any source whatsoever quantities of air contaminants or other material that cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public, or that endanger the comfort, repose, health, or safety of any of those persons or the public, or that cause, or have a natural tendency to cause, injury or damage to business or property.

212.   On occasions too numerous to mention, Defendants violated South Coast AQMD Rule 402 and California Health & Safety Code § 41700 by negligently: constructing, maintaining and/or operating the Landfill, causing the Subsurface Reaction, failing to prevent the Subsurface Reaction, failing to stop the Subsurface reaction, and failing to abate the effects of the Subsurface Reaction.

213.   On occasions too numerous to mention, Defendants violated South Coast AQMD Rule 402 and California Health & Safety Code § 41700 by discharging noxious odors, pollutants, and air contaminants, and permitting these noxious odors, pollutants, and air contaminants, to invaded public spaces and Plaintiffs' properties.

214.   To date, South Coast AQMD has received more than 20,000 complaints from community members regarding the noxious odors emanating from the Landfill and has issued more than 100 notices of violation of South Coast AQMD Rule 402 and California Health & Safety Code § 41700 to the Landfill because of these odors.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

215.   Defendants' violations of South Coast AQMD Rule 402 and California Health & Safety Code § 41700 directly and proximately caused Plaintiffs to suffer serious personal injury and damages to their properties as alleged herein.

216.   South Coast AQMD Rule 402 and California Health & Safety Code § 41700 were adopted to prevent the discharge of noxious odors, pollutants, and air contaminants and the resultant health and property harms, like those suffered by Plaintiffs.

217.   Plaintiffs were and are among the class of persons that South Coast AQMD Rule 402 and California Health & Safety Code § 41700 were intended to protect.

218.   Defendants' unnumerable violations of South Coast AQMD Rule 402 and California Health & Safety Code § 41700 were committed knowingly, maliciously, and with a conscious disregard of the rights or safety of others.

219.   Plaintiffs are entitled to compensatory, exemplary, and punitive damages, medical monitoring, injunctive relief, and reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and otherwise.

### PRAYER FOR RELIEF

Plaintiffs request relief against all Defendants as follows:

1.   Judgment in favor of Plaintiffs and against Defendants on all claims;

2.   Injunctive relief against Defendants to prevent further harm to Plaintiffs, including provisions for Defendants' remediation of the nuisance, ongoing monitoring of Plaintiffs' property, forfeiture and/or relinquishment of the Landfill's CUP, permanent closure of the Landfill, and implementation of a closure plan;

3.   Compensatory and general damages to be proven at trial, to include:

(a)   Damages for personal injuries;

(b)   Damages for harm to real and/or personal property, including diminution of property value;

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

(c)    Damages for the lost use of or the lost quiet enjoyment of real and/or personal property;

(d)    Damages for past medical and incidental expenses;

(e)    Damages for lost wages, earning capacity, business profits or proceeds and/or any related displacement expenses;

(f)    Damages for the cost of future medical monitoring; and

(g)    Damages for fear, worry, annoyance, discomfort, disturbance, inconvenience, mental anguish, and emotional distress;

4.    An award of punitive and exemplary damages against Chiquita Canyon LLC;[3]

5.    An award of attorneys' fees, pursuant to California Code of Civil Procedure § 1021.5 and any other appropriate source, and all other costs of suit;

6.    An award of pre-judgment and post-interest; and

7.    Any further relief the Court deems just and proper.

Dated: February 10, 2025                    Respectfully submitted,

**OURFALIAN & OURFALIAN**

*Sarkis Ourfalian*

**Sarkis Ourfalian, Esq.**
**Rafi Ourfalian, Esq.**

*Attorneys for Plaintiffs*

---

[3] Plaintiffs reserve the right to amend this pleading to seek punitive and exemplary damages against Chiquita Canyon Inc. and Waste Connections if evidence is found to support such recovery.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs hereby demand a jury trial.

3

4   Dated: February 10, 2025                    Respectfully submitted,

5                                               **OURFALIAN & OURFALIAN**

6

7                          *Sarkis Ourfalian*
                         _____
8                          **Sarkis Ourfalian, Esq.**
                         **Rafi Ourfalian, Esq.**
9
                         *Attorneys for Plaintiffs*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL